IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | CIVIL NO. DNCW3:18CV00371 |
| | ) | (Financial Litigation Unit) |
| | ) | |
| JERRY AUSTIN SIMMONS | ) | |
| Defendant. | ) | |

## **COMPLAINT**

The United States of America, by and through its undersigned counsel, for its cause of action against Defendant states the following:

1.      Plaintiff is the United States of America ("United States") and this Court has jurisdiction over the subject matter of this action by virtue of 28 U.S.C. §1345.  This is a debt collection action pursuant to the Federal Debt Collection Procedures Act of 1990, 28 U.S.C. §3001 *et seq.*

2.      Defendant, Jerry Austin Simmons, is a resident of the City of Charlotte, Mecklenburg County, North Carolina, residing within the jurisdiction of this Court in the Western District of North Carolina.

3.      Defendant is not in the military service within the purview of the Soldiers' and Sailors' Civil Relief Act of 1940, as amended by the Service Members' Civil Relief Act of 2003.

4.      Defendant has been ordered to pay a civil monetary penalty as a result of an Order in the Southern District of New York.  *See U.S. Commodity Futures Trading Commission vs. FTS Financial Inc. et al.* Case No. 1:16CV07513 (S.D. NY. Oct. 25, 2017).  Defendant has defaulted

on the obligation to pay the civil penalty.  Pursuant to 34 C.F.R. § 685.202(b), unpaid interest was capitalized and added to the principal balance.

5.　　Defendant is indebted to Plaintiff the total amount of $361,888.60 which includes: principal amount of $360,000.00 and interest of $1.888.60 as of March 12, 2018, and interest thereafter on this principal at the applicable note rate from this date until the date of judgment.

6.　　A copy of the Certificate of Indebtedness establishing the basis for Defendant's liability for this debt and a copy of the Consent Order signed by Defendant are attached to this Complaint as Exhibit A and B and incorporated by reference.

7.　　Demand has been made upon Defendant by Plaintiff for the amount owed but Defendant has failed to pay same.

Wherefore, Plaintiff prays for judgment against Defendant for the total amount of $361,888.60 as of March 12, 2018, plus interest from the filing of this complaint to the date of judgment, the costs of this action and such other and further relief to which Plaintiff may be entitled in law or equity.  Plaintiff further demands, pursuant to 28 U.S.C. §1961, that interest on the judgment be at the legal rate until paid in full.

This July 9, 2018.

R. ANDREW MURRAY
UNITED STATES ATTORNEY
WESTERN DISTRICT OF NORTH CAROLINA

**s/Tiffany Mallory Moore**
Assistant United States Attorney
GASB# 744522
227 West Trade Street, Suite 1650
Charlotte, NC 28202
Ph: 704-344-6222
Fx: 704-227-0248
Tiffany.Moore2@usdoj.gov

**U.S. COMMODITY FUTURES TRADING COMMISSION**

Three Lafayette Centre
1155 21st Street, NW, Washington, DC 20581
Telephone: (202) 418-5000
Facsimile: (202) 418-5521
*www.cftc.gov*

Mary Jean Buhler
Chief Financial Officer

**Financial Management
Branch**

### CERTIFICATE OF INDEBTEDNESS

Debtor Name                        Jerry Austin Simmons
and Addresses:

Total debt due United States as of October 25, 2017: $360,000 plus interest

      I certify that the records of the U.S. Commodity Futures Trading Commission (CFTC) show that Jerry Austin Simmons (Simmons) is indebted to the United States in the amount of $360,000 plus additional interest on the principal balance from October 25, 2017 at the annual rate of 1.42%.

      The claim arose in connection with an October 25, 2017 Order that was issued by the United States District Court for the Southern District of New York against Simmons. *See CFTC v. FTS Financial Inc. et al.,* No. 1:16-cv-07513 (S.D. NY. Oct. 25, 2017). Pursuant to the Order, Simmons was directed to pay a civil monetary penalty (CMP) in the amount of $180,000 and disgorgement in the amount $180,000.

      Simmons has not made any payments to satisfy his CMP and disgorgement obligations and the CFTC has been unable to identify any assets of Simmons. Accordingly, the CFTC is referring this matter to the Department of Justice for enforced collection and a current assessment on whether Simmons have assets to pay the CMP and disgorgement obligations.

      As of March 12, 2018, Simmons is obligated to pay a CMP and disgorgement amounting to $361,888.60. This amount represents the following: (a) the CMP principal judgment of $180,000 plus post judgment interest of $944.30; and (b) the disgorgement principal judgment of $180,000 plus post judgment interest of $944.30. Any questions regarding this matter should be directed to Linda Lightner of my staff at the above address or you may contact her by telephone at (202) 418-5227 or by e-mail at llightner@cftc.gov.

**CERTIFICATION**: Pursuant to 28 U.S.C. § 1746, I certify under penalty of perjury that the foregoing is true and correct.

Keith Ingram
Accounting Officer

3/15/18
(Date)

EXHIBIT B

Case 1:16-cv-07513-RA   Document 46   Filed 10/25/1   Page 1 of 21
Case 1:16-cv-07513-RA   Document 43-2   Filed 10/24/17   Page 1 of 21

# ATTACHMENT B

USDC-SDNY
DOCUMENT

**UNITED STATES DISTRICT COURT** ELECTRONICALLY FILED
**SOUTHERN DISTRICT OF NEW YORK** DOC #:

DATE FILED: 10/25/17

---

U.S. COMMODITY FUTURES TRADING
COMMISSION,

Plaintiff,

v.

FTS FINANCIAL, INC., KEVIN MICHAEL
SYMONS, and JERRY AUSTIN SIMMONS,

Defendants.

Case No. 16-CV-7513 (RA) (GWG)

---

## CONSENT ORDER FOR PERMANENT INJUNCTION, CIVIL MONETARY PENALTY AND OTHER EQUITABLE RELIEF AGAINST DEFENDANT JERRY AUSTIN SIMMONS

### I. INTRODUCTION

On September 26, 2016, Plaintiff U.S. Commodity Futures Trading Commission

("Commission" or "CFTC") filed a Complaint against Defendant FTS Financial, Inc. ("FTS"),

Defendant Kevin Michael Symons ("Symons"), and Defendant Jerry Austin Simmons

("Simmons" or "Defendant Simmons") seeking injunctive and other equitable relief, as well as

the imposition of civil penalties, for violations of the Commodity Exchange Act ("Act"),

7 U.S.C. §§ 1 *et seq.*, and the Commission's Regulations ("Regulations") promulgated

thereunder, 17 C.F.R. § 1.1 *et seq.*

## II. CONSENTS AND AGREEMENTS

To effect settlement of all charges alleged in the Complaint against Defendant Simmons without a trial on the merits or any further judicial proceedings, Defendant Simmons:

1. Consents to the entry of this Consent Order for Permanent Injunction, Civil Monetary Penalty and Other Equitable Relief Against Defendant Jerry Austin Simmons ("Consent Order");

2. Affirms that he has read and agreed to this Consent Order voluntarily, and that no promise, other than as specifically contained herein, or threat, has been made by the Commission or any member, officer, agent or representative thereof, or by any other person, to induce consent to this Consent Order;

3. Acknowledges service of the summons and Complaint;

4. Admits the jurisdiction of this Court over him and the subject matter of this action pursuant to Section 6c of the Act, 7 U.S.C. § 13a-1 (2012);

5. Admits the jurisdiction of the Commission over the conduct and transactions at issue in this action pursuant to the Act, 7 U.S.C. §§ 1-26 (2012);

6. Admits that venue properly lies with this Court pursuant to Section 6c(e) of the Act, 7 U.S.C. § 13a-1(e) (2012);

7. Waives:

(a) Any and all claims that he may possess under the Equal Access to Justice Act, 5 U.S.C. § 504 (2012) and 28 U.S.C. § 2412 (2012), and/or the rules promulgated by the Commission in conformity therewith, Part 148 of the Regulations, 17 C.F.R. §§ 148.1 *et seq.* (2016), relating to, or arising from, this action;

(b) Any and all claims that he may possess under the Small Business Regulatory Enforcement Fairness Act of 1996, Pub. L. No. 104-121, §§ 201-253, 110 Stat. 847, 857-868

2

(1996), as amended by Pub. L. No. 110-28, § 8302, 121 Stat. 112, 204-205 (2007), relating to, or arising from, this action;

(c) Any claim of Double Jeopardy based upon the institution of this action or the entry in this action of any order imposing a civil monetary penalty or any other relief, including this Consent Order; and

(d) Any and all rights of appeal from this action;

8. Consents to the continued jurisdiction of this Court over him for the purpose of implementing and enforcing the terms and conditions of this Consent Order and for any other purpose relevant to this action, even if Defendant Simmons now or in the future resides outside the jurisdiction of this Court;

9. Agrees that he will not oppose enforcement of this Consent Order on the ground, if any exists, that it fails to comply with Rule 65(d) of the Federal Rules of Civil Procedure and hereby waives any objection based thereon;

10. Agrees that neither he nor any of his agents or employees under his authority or control shall take any action or make any public statement denying, directly or indirectly, any allegation in the Complaint or the Findings of Fact or Conclusions of Law in this Consent Order, or creating or tending to create the impression that the Complaint and/or this Consent Order is without a factual basis; provided, however, that nothing in this provision shall affect his: (a) testimonial obligations, or (b) right to take legal positions in other proceedings to which the Commission is not a party. Defendant Simmons shall undertake all steps necessary to ensure that all of his agents and/or employees under his authority or control understand and comply with this agreement;

3

11.     By consenting to the entry of this Consent Order, neither admits nor denies the allegations of the Complaint or the Findings of Fact and Conclusions of Law in this Consent Order, except as to jurisdiction and venue, which he admits. Further, Defendant Simmons agrees and intends that the allegations contained in the Complaint and all of the Findings of Fact and Conclusions of Law contained in this Consent Order shall be taken as true and correct and be given preclusive effect, without further proof, in the course of: (a) any current or subsequent bankruptcy proceeding filed by, on behalf of, or against Defendant Simmons; (b) any proceeding pursuant to Section 8a of the Act, 7 U.S.C. § 12a (2012), and/or Part 3 of the Regulations, 17 C.F.R. §§ 3.1 – 3.75 (2016); and/or (c) any proceeding to enforce the terms of this Consent Order. Defendant Simmons does not consent to the use of this Consent Order, or the Findings of Fact and Conclusions of Law in this Consent Order, as the sole basis for any other proceeding brought by the Commission;

12.     Agrees to provide immediate notice to this Court and the Commission by certified mail, in the manner required by paragraph 66 of Part VI of this Consent Order, of any bankruptcy proceeding filed by, on behalf of, or against him, whether inside or outside the United States; and

13.     Agrees that no provision of this Consent Order shall in any way limit or impair the ability of any other person or entity to seek any legal or equitable remedy against Defendant Simmons in any other proceeding.

## III. FINDINGS AND CONCLUSIONS

The Court, being fully advised in the premises, finds that there is good cause for the entry of this Consent Order and that there is no just reason for delay. The Court therefore directs the entry of the following Findings of Fact, Conclusions of Law, permanent injunction and equitable

4

relief pursuant to Section 6c of the Act, 7 U.S.C. § 13a-1 (2012), as set forth herein. The

findings and conclusions in this Consent Order are not binding on any other party to this action.

## THE PARTIES AGREE TO THIS CONSENT ORDER AND THE COURT HEREBY FINDS:

### A.  Findings of Fact

#### The Parties To This Consent Order

14.     Plaintiff **U.S. Commodity Futures Trading Commission** is an independent

federal regulatory agency that is charged by Congress with administering and enforcing the Act,

7 U.S.C. §§ 1-26 (2012), and the Regulations promulgated thereunder, 17 C.F.R. §§ 1.1 – 190.10

(2016).

15.     Defendant **Jerry Austin Simmons** is an individual who resides in Charlotte,

North Carolina. From at least in or around August 2012 and continuing through in or around

November 2013 (the "Relevant Period"), Simmons operated the Real Time Trade Room (the

"Room") and solicited Room clients to open managed futures trading accounts over which

Simmons maintained trading authority. Although Simmons has been registered with the

Commission as a Commodity Trading Advisor ("CTA") and Associated Person ("AP") since

April 2014 and was previously registered with the Commission from 2003 to April 2012 in

various capacities including as a CTA and as an Associated Person of a Commission registrant,

Simmons was not registered with the Commission in any capacity during the Relevant Period.

#### Simmons' Fraudulent Solicitation

16.     During the Relevant Period, Simmons operated the Room, an online forum in

which subscribers, for a fee, could observe Simmons as he ostensibly traded futures contracts.

5

17.     During the Relevant Period, Simmons' Room was marketed as an online forum in
which subscribers could learn to trade futures contracts by observing Simmons (portrayed to
clients as a "professional trader"), as he supposedly traded "live" and in "real time."

18.     Simmons told Clients that the "primary trading vehicle" in the Room was futures
contracts. Promotional materials for the Room stated that Simmons "targets five to eight trades
per day," focusing on S&P 500, Russell 2000, crude oil, gold, and interest rate futures contracts,
each of which is traded on or subject to the rules of a designated contract market.

19.     Clients were told that Simmons traded futures contracts "live" with real money at
risk.

20.     Simmons himself told Clients by email that he engaged in "live" trading in the
Room. Simmons sent certain Clients an email after they decided to purchase access to the
Room, including emails Simmons sent to multiple Clients dated January 14, 2013, stating that
"coupled with live market trading in the Real Time Trade Room (RTTR), [our training materials]
offer[] a comprehensive training program uniquely qualified to improve, enhance, and expand
the overall ability and performance of any individual ranging from a novice beginner to a
seasoned professional."

21.     Simmons' statements to Clients that Simmons traded "live" in the Room were
false because Simmons has never actually traded any futures contracts in the Room at all.

22.     Simmons never put any money at risk when "trading" in the Room. Rather,
Simmons either called out hypothetical trades in the Room or demonstrated hypothetical or
simulated trades in the Room on an electronic trading platform in simulation mode, but in either
case never actually executed any futures trades in the Room and never actually placed any
money at risk.

6

23. The difference between actual trading and hypothetical or simulated trading is significant because hypothetical or simulated trading does not involve trades that have actually been executed and therefore may under- or over-compensate for the impact of certain market factors such as lack of liquidity.

24. Moreover, because hypothetical or simulated trading does not involve actual trade execution, so-called performance results from such trading necessarily fail to reflect slippage costs, i.e., the difference in price of an actual trade at the time the order is placed and the time the order is filled.

25. Simmons created a track record of his supposed trading in the Room, knowing that the performance information would be used to solicit Clients.

26. Simmons testified under oath that none of this past performance information was ever based on any actual trading. Rather, Simmons stated that when he created the performance information for January to July 2012, he used his "best estimate." Simmons testified that he came up with the performance history (1) by consulting notes he made regarding the general daily performance of his hypothetical or simulated trades and (2) for those days that he did not have such notes, by reconstructing the hypothetical trades that he believed he would have made based on his trading plan.

27. The monthly profits in the track record created by Simmons and disseminated to Clients were false and misleading because Simmons never actually traded any futures contracts in the Room, much less earned any trading profit doing so.

28. Simmons created an "orientation" video, access to which was provided to Clients who purchased access to the Room.

7

29.    In that video, Simmons was described as a "master trader," "a fantastic talent," and "an unbelievable trader, incredibly successful, high-level trader." The video described Simmons as being "at the absolute pinnacle of his profession" and stated that "he is at the absolute top of this trading game not just in our country but in the world."

30.    The video further stated that Simmons trades "live" in the Room and that "you'll actually see him physically enter the trade order…you'll see that order get filled and then you'll see the order either go on to be a winner or to be a loser, so all that is going to be happening right before your eyes, pretty cool."

31.    In the video, Simmons himself referred to "live trades" in the Room, stated that "we do real time trading [in the Room] throughout the day," and stated that he would identify "key trading opportunities," and that "we're going to average three to five trades a day."

32.    By referring to "live" trading in the Room (both in the emails referred to in paragraph 20 and the video referred to in paragraphs 28 to 31, above), Simmons knowingly or recklessly created the false impression that he traded futures contracts in the Room with real money at risk.

33.    By creating the false impression that he traded futures contracts in the Room with real money at risk, Simmons misled Clients regarding his expertise trading futures contracts. Indeed, Simmons testified under oath that, although he never actually traded futures contracts in the Room, he "absolutely" believed that "trades executed live [with a] real-time executed brokerage statement" were more authentic than simulated trades because simulated trades do not account for slippage.

8

34.     The statements contained in paragraphs 20 and 28 through 31, above, concerning Simmons' live trading in the Room were false and misleading because Simmons in fact never actually traded any futures contracts in the Room.

35.     Moreover, Simmons was not an experienced, successful professional trader. What little futures trading Simmons had actually done (trading in his personal trading account for a short time in the 1970s) had not been profitable.

**Simmons Solicited Managed Accounts But Failed to Register with the Commission**

36.     After Clients purchased access to the Room, Simmons further solicited those Clients to participate in the Broker Assist Program ("BAP").

37.     Clients who elected to participate in the BAP agreed to pay a fee in exchange for which Simmons agreed to manage the futures trading in those Clients' accounts.

38.     In a promotional video created by Simmons and distributed to Room Clients for the purpose of soliciting them to participate in the BAP, Simmons asserted that the BAP was designed for individuals who "do not have enough time to actively trade the markets during the day."

39.     Many, if not most, of the Clients who were solicited to participate in the BAP, had previously purchased access to the Room.

40.     Consequently, these Clients had been told, falsely, that Simmons was a successful professional trader and that he had earned substantial profits trading live in the Room. As described above, these claims were false.

41.     Despite the fact that Simmons had not actually traded futures contracts since the 1970s and despite the fact that those efforts had not been successful, Simmons stated in the BAP solicitation video that the BAP had a monthly income goal of $1,500 on a $20,000 investment (which amounts to an annual return of 90%).

9

42.     In order to participate in the BAP, Clients were required to open futures trading accounts with a broker specified by Simmons and to deposit funds into their trading accounts.

43.     According to the promotional video created by Simmons to solicit for the BAP, Simmons would "direct[]" Client accounts. BAP Clients were required to execute a letter of direction that obligated the broker to execute trades in Clients' accounts following, Simmons' directions.

44.     Clients agreed to pay a monthly fee for participation in the BAP, to be calculated based on the amount of capital deposited by the Client into his or her trading account.

45.     Despite the fact that Simmons had authority to trade BAP participant accounts, and despite the fact that Simmons solicited BAP Clients, Simmons was not registered in any capacity with the Commission during the Relevant Period.

**B.     Conclusions of Law**

**Jurisdiction and Venue**

46.     This Court has jurisdiction over this action pursuant to Section 6c of the Act, 7 U.S.C. § 13a-1 (2012), which provides that whenever it shall appear to the Commission that any person has engaged, is engaging, or is about to engage in any act or practice constituting a violation of any provision of the Act or any rule, regulation, or order promulgated thereunder, the Commission may bring an action in the proper district court of the United States against such person to enjoin such act or practice, or to enforce compliance with the Act, or any rule, regulation or order thereunder.

47.     Venue properly lies with this Court pursuant to Section 6c(e) of the Act, 7 U.S.C. § 13a-1(e) (2012), because acts and practices in violation of the Act occurred within this District.

10

**Fraud by Misrepresentations and Omissions**

48.     By the conduct described in paragraphs 15 through 47 above, Defendant Simmons employed a scheme or artifice to defraud Clients in connection with futures contracts traded on registered entities by making misrepresentations and material omissions to Clients, in violation of Section 6(c)(1) of the Act, 7 U.S.C. § 9(c)(1) (2012), and Commission Regulation 180.1(a), 17 C.F.R. § 180.1(a) (2015) by, among other things, knowingly or recklessly:

a.     Creating a false and misleading track record of his purported "trading" in the Room, knowing that the results were not based on records of trades taken in the Room but rather were Simmons' "best estimate" of his supposed profits based in large part on after-the-fact reconstructions of hypothetical trades that he believed he would have taken, and knowing that the performance record would be used to solicit Clients;

b.     Telling Clients (including, for example, by email to multiple Clients on January 14, 2013) that he engaged in "live market trading" in the Room (when in reality, Simmons only ever engaged in hypothetical or simulated trading); and

c.     Creating promotional material that was made available to Clients that falsely described Simmons variously as, among other things, a "master trader," "a fantastic talent," and "an unbelievable trader, incredibly successful, high-level trader," and falsely stated that Simmons traded "live" in the Room and that referred to Simmons' "live trades" (when in reality Simmons never actually traded futures contracts in the Room and what little experience Simmons had trading futures contracts for himself – in the 1970s – had not been successful).

11

**Failure to Register as an AP of a CTA**

49.     By the conduct described in paragraphs 15 to 48 above, Defendant Simmons

solicited managed futures accounts but failed to register with the Commission as an Associated

Person of a CTA, in violation of Section 4k(3) of the Act, 7 U.S.C. § 6k(3) (2012), and

Commission Regulation 3.12(a), 17 C.F.R. § 3.12(a) (2016).

50.     Unless restrained and enjoined by this Court, there is a reasonable likelihood that

Defendant Simmons will continue to engage in the acts and practices alleged in the Complaint

and in similar acts and practices in violation of the Act and Commission Regulations.

## IV. PERMANENT INJUNCTION

**IT IS HEREBY ORDERED THAT:**

51.     Based upon and in connection with the foregoing conduct, pursuant to Section 6c

of the Act, 7 U.S.C. § 13a-1 (2012), Defendant Simmons is permanently restrained, enjoined and

prohibited from directly or indirectly:

a.     using or employing, or attempting to use or employ, any manipulative device,

        scheme, or artifice to defraud; making, or attempting to make, any untrue or

        misleading statement of a material fact or omitting to state a material fact

        necessary in order to make the statements made not true or misleading; or

        engaging, or attempting to engage, in any act, practice, or course of business,

        which operates or would operate as a fraud or deceit upon any person in violation

        of Section 6(c)(1) of the Act, 7 U.S.C. § 9(c)(1) (2012) or Commission

        Regulation 180.1(a), 17 C.F.R. § 180.1(a) (2016); or

b.     being associated with a CTA as a partner, officer, employee, consultant, or agent

        (or any person occupying a similar status or performing similar functions), in any

12

capacity which involves the solicitation of a client's or prospective client's

discretionary account and failing to register with the Commission as an associated

person of such CTA, in violation of Section 4k(3) of the Act, 7 U.S.C. § 6k(3)

(2012), and Commission Regulation 3.12(a), 17 C.F.R. § 3.12(a) (2016).

52.    Defendant Simmons is also permanently restrained, enjoined and prohibited from

directly or indirectly:

a.    Trading on or subject to the rules of any registered entity (as that term is defined

    in Section 1a(40) of the Act, 7 U.S.C. § 1a(40) (2012));

b.    Entering into any transactions involving "commodity interests" (as that term is

    defined in Regulation 1.3(yy), 17 C.F.R. § 1.3(yy) (2016) for his own personal

    account or for any account in which he has a direct or indirect interest;

c.    Having any commodity interests traded on his behalf;

d.    Controlling or directing the trading for or on behalf of any other person or entity,

    whether by power of attorney or otherwise, in any account involving commodity

    interests;

e.    Soliciting, receiving or accepting any funds from any person for the purpose of

    purchasing or selling any commodity interests;

f.    Applying for registration or claiming exemption from registration with the

    Commission in any capacity, and engaging in any activity requiring such

    registration or exemption from registration with the Commission, except as

    provided for in Regulation 4.14(a)(9), 17 C.F.R. § 4.14(a)(9) (2016); and/or

g.    Acting as a principal (as that term is defined in Regulation 3.1(a), 17 C.F.R.

    § 3.1(a) (2016)), agent or any other officer or employee of any person (as that

13

term is defined in Section 1a(38) of the Act, 7 U.S.C. § 1a(38) (2012)), registered,

exempted from registration or required to be registered with the Commission

except as provided for in Regulation 4.14(a)(9), 17 C.F.R. § 4.14(a)(9) (2016).

## V. DISGORGEMENT AND CIVIL MONETARY PENALTY

### A.   Disgorgement

53.   Defendant Simmons shall pay disgorgement in the amount of one hundred eighty

thousand dollars ($180,000) ("Disgorgement Obligation"), plus post-judgment interest. Post-

judgment interest shall accrue on the Disgorgement Obligation beginning on the date of entry of

this Consent Order and shall be determined by using the Treasury Bill rate prevailing on the date

of entry of this Consent Order pursuant to 28 U.S.C. § 1961 (2012).

54.   To effect payment of the Disgorgement Obligation and the distribution of any

disgorgement payments to Defendant Simmons' clients, the Court appoints the National Futures

Association ("NFA") as Monitor ("Monitor"). The Monitor shall collect disgorgement payments

from Defendant Simmons and make distributions as set forth below. Because the Monitor is

acting as an officer of this Court in performing these services, the NFA shall not be liable for any

action or inaction arising from NFA's appointment as Monitor, other than actions involving

fraud.

55.   Defendant Simmons shall make Disgorgement Obligation payments under this

Consent Order to the Monitor in the name "Jerry Austin Simmons – Settlement/Disgorgement

Fund" and shall send such Disgorgement Obligation payments by electronic funds transfer, or by

U.S. postal money order, certified check, bank cashier's check, or bank money order, to the

Office of Administration, National Futures Association, 300 South Riverside Plaza, Suite 1800,

Chicago, Illinois 60606 under cover letter that identifies the paying Defendant and the name and

14

docket number of this proceeding. Defendant Simmons shall simultaneously transmit copies of the cover letter and the form of payment to the Chief Financial Officer, Commodity Futures Trading Commission, Three Lafayette Centre, 1155 21st Street, NW, Washington, D.C. 20581 and to R. Stephen Painter, Jr., Commodity Futures Trading Commission, 140 Broadway, 19th Floor, New York, NY 10005.

56. The Monitor shall oversee the Disgorgement Obligation and shall have the discretion to determine the manner of distribution of such funds in an equitable fashion to Defendant Simmons' clients identified by the Commission or may defer distribution until such time as the Monitor deems appropriate. In the event that the amount of Disgorgement Obligation payments to the Monitor are of a *de minimis* nature such that the Monitor determines that the administrative cost of making a distribution to eligible clients is impractical, the Monitor may, in its discretion, treat such disgorgement payments as civil monetary penalty payments, which the Monitor shall forward to the Commission following the instructions for civil monetary penalty payments set forth in Part B below.

57. Defendant Simmons shall cooperate with the Monitor as appropriate to provide such information as the Monitor deems necessary and appropriate to identify Defendant Simmons' clients to whom the Monitor, in its sole discretion, may determine to include in any plan for distribution of any Disgorgement Obligation payments. Defendant Simmons shall execute any documents necessary to release funds that he has in any repository, bank, investment or other financial institution, wherever located, in order to make partial or total payment toward the Disgorgement Obligation.

58. The Monitor shall provide the Commission at the beginning of each calendar year with a report detailing the disbursement of funds to Defendant Simmons' clients during the

15

previous year. The Monitor shall transmit this report under a cover letter that identifies the name and docket number of this proceeding to the Chief Financial Officer, Commodity Futures Trading Commission, Three Lafayette Centre, 1155 21st Street, NW, Washington, D.C. 20581.

59. The amounts payable to each client shall not limit the ability of any client from proving that a greater amount is owed from Defendant Simmons or any other person or entity, and nothing herein shall be construed in any way to limit or abridge the rights of any client that exist under state or common law.

60. Pursuant to Rule 71 of the Federal Rules of Civil Procedure, each client of Defendant Simmons who suffered a loss is explicitly made an intended third-party beneficiary of this Consent Order and may seek to enforce obedience of this Consent Order to obtain satisfaction of any portion of the disgorgement that has not been paid by Defendant Simmons to ensure continued compliance with any provision of this Consent Order and to hold Defendant Simmons in contempt for any violations of any provision of this Consent Order.

61. To the extent that any funds accrue to the U.S. Treasury for satisfaction of Defendant Simmons' Disgorgement Obligation, such funds shall be transferred to the Monitor for disbursement in accordance with the procedures set forth above.

**B. Civil Monetary Penalty**

62. Defendant Simmons shall pay a civil monetary penalty in the amount of one hundred eighty thousand dollars ($180,000) ("CMP Obligation"), plus post-judgment interest. Post-judgment interest shall accrue on the CMP Obligation beginning on the date of entry of this Consent Order and shall be determined by using the Treasury Bill rate prevailing on the date of entry of this Consent Order pursuant to 28 U.S.C. § 1961 (2012).

63. Defendant Simmons shall pay his CMP Obligation by electronic funds transfer, U.S. postal money order, certified check, bank cashier's check, or bank money order. If payment

16

is to be made other than by electronic funds transfer, then the payment shall be made payable to

the Commodity Futures Trading Commission and sent to the address below:

> Commodity Futures Trading Commission
> Division of Enforcement
> ATTN: Accounts Receivables
> DOT/FAA/MMAC/AMZ-341
> CFTC/CPSC/SEC
> 6500 S. MacArthur Blvd.
> Oklahoma City, OK 73169
> (405) 954-7262 office
> (405) 954-1620 fax
> nikki.gibson@faa.gov

If payment by electronic funds transfer is chosen, Defendant Simmons shall contact Nikki

Gibson or her successor at the address above to receive payment instructions and shall fully

comply with those instructions. Defendant Simmons shall accompany payment of the CMP

Obligation with a cover letter that identifies Defendant Simmons and the name and docket

number of this proceeding. Defendant Simmons shall simultaneously transmit copies of the

cover letter and the form of payment to the Chief Financial Officer, Commodity Futures Trading

Commission, Three Lafayette Centre, 1155 21st Street, NW, Washington, D.C. 20581 and to R.

Stephen Painter, Jr., Chief Trial Attorney, Commodity Futures Trading Commission, 140

Broadway, 19th Floor, New York, NY 10005.

## C.    Provisions Related to Monetary Sanctions

64.    Partial Satisfaction: Acceptance by the Commission of any partial payment of

Defendant Simmons' Disgorgement Obligation or CMP Obligation shall not be deemed a waiver

of his obligation to make further payments pursuant to this Consent Order, or a waiver of the

Commission's right to seek to compel payment of any remaining balance.

17

## D.   Cooperation

65.   Defendant Simmons shall cooperate fully and expeditiously with the Commission,

including the Commission's Division of Enforcement, and any other governmental agency in this

action, and in any investigation, civil litigation, or administrative matter related to the subject

matter of this action or any current or future Commission investigation related thereto.  As part

of such cooperation, Defendant Simmons agrees to testify in *CFTC v. FTS Financial, Inc., et al.*,

16-CV-7513 (S.D.N.Y. 2016), if called by the Commission as a witness.

## VI.  MISCELLANEOUS PROVISIONS

66.   Notice: All notices required to be given by any provision in this Consent Order

shall be sent certified mail, return receipt requested, as follows:

Notice to Commission:

Manal M. Sultan, Deputy Director
Division of Enforcement
U.S. Commodity Futures Trading Commission
140 Broadway, 19th Floor
New York, NY 10005

Notice to Defendant Simmons:

Jerry Austin Simmons



All such notices to the Commission shall reference the name and docket number of this action.

67.   Change of Address/Phone: Until such time as Defendant Simmons satisfies in

full his Disgorgement Obligation and CMP Obligation as set forth in this Consent Order,

Defendant Simmons shall provide written notice to the Commission by certified mail of any

change to his telephone number and mailing address within ten (10) calendar days of the change.

68.   Entire Agreement and Amendments: This Consent Order incorporates all of the

terms and conditions of the settlement among the parties hereto to date.  Nothing shall serve to

18

amend or modify this Consent Order in any respect whatsoever, unless: (a) reduced to writing; (b) signed by all parties hereto; and (c) approved by order of this Court.

69. Invalidation: If any provision of this Consent Order or if the application of any provision or circumstance is held invalid, then the remainder of this Consent Order and the application of the provision to any other person or circumstance shall not be affected by the holding.

70. Waiver: The failure of any party to this Consent Order or of any customers or clients at any time to require performance of any provision of this Consent Order shall in no manner affect the right of the party, customer, or client at a later time to enforce the same or any other provision of this Consent Order. No waiver in one or more instances of the breach of any provision contained in this Consent Order shall be deemed to be or construed as a further or continuing waiver of such breach or waiver of the breach of any other provision of this Consent Order.

71. Waiver of Service, and Acknowledgement: Defendant Simmons waives service of this Consent Order and agrees that entry of this Consent Order by the Court and filing with the Clerk of the Court will constitute notice to Defendant Simmons of its terms and conditions. Defendant Simmons further agrees to provide counsel for the Commission, within thirty (30) days after this Consent Order is filed with the Clerk of Court, with an affidavit or declaration stating that Defendant Simmons has received and read a copy of this Consent Order.

72. Continuing Jurisdiction of this Court: This Court shall retain jurisdiction of this action to ensure compliance with this Consent Order and for all other purposes related to this action, including any motion by Defendant Simmons to modify or for relief from the terms of this Consent Order.

19

73. Injunctive and Equitable Relief Provisions: The injunctive and equitable relief provisions of this Consent Order shall be binding upon Defendant Simmons, upon any person under his authority or control, and upon any person who receives actual notice of this Consent Order, by personal service, e-mail, facsimile or otherwise insofar as he or she is acting in active concert or participation with Defendant Simmons.

74. Counterparts and Facsimile Execution: This Consent Order may be executed in two or more counterparts, all of which shall be considered one and the same agreement and shall become effective when one or more counterparts have been signed by each of the parties hereto and delivered (by facsimile, e-mail, or otherwise) to the other party, it being understood that all parties need not sign the same counterpart. Any counterpart or other signature to this Consent Order that is delivered by any means shall be deemed for all purposes as constituting good and valid execution and delivery by such party of this Consent Order.

75. Contempt: Defendant Simmons understands that the terms of the Consent Order are enforceable through contempt proceedings, and that, in any such proceedings he may not challenge the validity of this Consent Order.

There being no just reason for delay, the Clerk of the Court is hereby ordered to enter this *Consent Order for Permanent Injunction, Civil Monetary Penalty and Other Equitable Relief Against Defendant Jerry Austin Simmons* forthwith and without further notice.

IT IS SO ORDERED on this 25th day of October, 2017.

RONNIE ABRAMS
UNITED STATES DISTRICT JUDGE

20

CONSENTED TO AND APPROVED BY:

Jerry Austin Simmons

Date: 3/23/2017

R. Stephen Painter, Jr.
Chief Trial Attorney
Commodity Futures Trading Commission
140 Broadway, 19th Floor
New York, NY 10005
(646) 746-9815 (office)
(646) 746-9739 (fax)
spainter@cftc.gov

Dated 10/24/17